RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0134p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ABDUL KADER AHMED BAAGHIL,

*Plaintiff*,

KHALED ABDO ALI AHMED; MALEKAH ALI AL
WAHASI; AKRAM KHALED ABDO ALI AHMED;
MOHAMED ABDO ALI AHMED,

*Plaintiffs-Appellants*,

> No. 20-1802

*v.*

STEPHEN MILLER, et al.,

*Defendants*,

MERRICK B. GARLAND, Attorney General, ANTONY
BLINKEN, Secretary of State, and TRACY RENAUD,
Acting Director of United States Citizenship and
Immigration Services, in their official capacities;
UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:19-cv-11138—David M. Lawson, District Judge.

Decided and Filed:  June 14, 2021

Before:  SUTTON, Chief Judge; DAUGHTREY and GRIFFIN, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:**  Julie A. Goldberg, GOLDBERG & ASSOCIATES, Bronx, New York, for
Appellants.  Joshua S. Press, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellees.

———————————

## OPINION

———————————

SUTTON, Chief Judge.   Khaled Abdo Ali Ahmed, a lawful permanent resident, applied for visas for his wife and children.  A United States consulate eventually denied the applications. Through his original complaint and his failed request to amend that complaint, Ahmed sought relief in federal district court, urging the court to reverse the consulate's decision on a variety of grounds.  The court declined, and we affirm.

I.

A.

The Immigration and Nationality Act requires noncitizens to obtain visas before they enter the United States.  8 U.S.C. § 1181(a).  The Act creates a special visa-application process for a spouse or child of a lawful permanent resident.  *See id.* § 1153(a)(2)(A).  To start the process, the lawful permanent resident must file a "Form I-130."  8 C.F.R. § 204.1(a)(1).  Once filed, the United States Citizenship and Immigration Services determines the relative's eligibility for a visa.  *Id.*; *see* 8 U.S.C. § 1154(a)(1)(A)(i).  If the agency approves the I-130 petition, the relative must visit a United States consulate for additional processing.  *Id.* § 1201(a)(1).  The consulate undertakes its own investigation, which includes interviewing the family member who requested the visa.  *Id.* § 1202(h).  The consular official must refrain from issuing the visa if the official "knows or has reason to believe" that the applicant does not qualify.  *Id.* § 1201(g).

If, in the course of the visa inquiry, the consular official comes to believe that Immigration Services should not have initially approved the I-130 petition, the "consular officer shall . . . return the petition . . . [to Immigration Services] for reconsideration."  22 C.F.R. § 42.43(a).  Upon return of the petition to Immigration Services, an immigration officer may, after providing notice, "revoke the approval of" the lawful permanent resident's I-130 petition. 8 C.F.R. § 205.2(a).  That decision would end the effort to obtain visas for the permanent resident's family members, but it would not necessarily require the agency to revoke his status as a lawful permanent resident.

B.

In 1994, Khaled Abdo Ali Ahmed and Malekah Ali Al Wahasi allegedly were married. Ahmed lives in the United States as a lawful permanent resident. Wahasi lives abroad as a Yemeni citizen. Their two sons, both Yemeni citizens, currently live with their mother in Malaysia.

In 2008, Ahmed filed an I-130 petition on behalf of his wife and sons to bring them to the United States. The government approved the initial petition in 2011, allowing Ahmed's family to move ahead with their applications to join him. Ahmed's wife and children visited the U.S. consulate in Yemen to apply for the visas. Over the next few years, U.S. consulate officers interviewed the family several times, first in Yemen and later in Malaysia, where the family moved in 2016.

Consular officials grew suspicious that the family members were not who they said they were. They found a different name for Ahmed on file, noting that he went by "Hameedi" at some point. Apprehensive officals requested additional proof of identification. While the family gathered additional evidence, the consulate placed the applications into "administrative processing." R.55-2 at 2–4.

In 2017, President Trump issued Presidential Proclamation 9645. *See* 82 Fed. Reg. 45161. The executive order made it more difficult for Yemeni nationals to receive visas to enter the United States.

Soon after, Ahmed and his family joined a lawsuit, spearheaded by Abdul Kader Ahmed Baaghil, a U.S. citizen seeking to bring his family from Yemen to the United States, that challenged the validity of the Proclamation and the way in which the government handled their visas. In addition to challenging Proclamation 9645, they sought a writ of mandamus ordering the consulate to immediately resolve their visa applications. The government moved to dismiss the complaint.

Several developments altered the scope of the lawsuit. One was the U.S. Supreme Court's decision to uphold Proclamation 9645. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2415

(2018). In responding to the plaintiffs' claim that the Proclamation violated the Religion Clauses by banning certain groups on animus grounds, the Court reasoned that the Judicial Branch generally does not review the Executive's largely discretionary function to grant or deny visas under guidelines established by Congress. *Id.* at 2418–19. Even assuming that the Constitution restricted this executive branch policy and even assuming that rational basis review covered it, the Court upheld the Proclamation on the ground that legitimate national security concerns justified the visa policy. *Id.* at 2421.

The decision prompted a second development. Every plaintiff in today's case, except Ahmed and his family, either abandoned this lawsuit or was dismissed for improper joinder.

The third development came in November 2019, when the U.S. consulate in Malaysia denied the family's visa applications due to lingering concerns about their identities. At roughly the same time, the consulate sent Ahmed's I-130 petition to the U.S. Citizenship and Immigration Services office in Vermont for "review and possible revocation"—for further review, in other words, of whether it should continue to process the application or revoke it. R.55-2 at 2–3.

In the aftermath of these developments, Ahmed and his family moved to amend their complaint to challenge the visa denials and the potential revocation of Ahmed's I-130 petition. The court denied the request to amend as futile and dismissed the complaint.

II.

When the facts on the ground change, the nature of legal complaints in the courts sometimes changes. After the U.S. Supreme Court's decision to permit the President to issue Proclamation 9645, *Hawaii*, 138 S. Ct. at 2415, Ahmed and his family tacked in a new direction. Instead of challenging the validity of the Proclamation, they sought to amend their complaint to challenge the consulate's denial of their visa applications and the possible future revocation of Ahmed's status as a lawful permanent resident. Civil Rule 15(a) provides that leave to amend should be "freely give[n] when justice so requires." But a court may deny a motion to amend a complaint when the amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). If a court denies leave to amend based on futility grounds, as the district court did here, we

review the decision with fresh eyes. *See Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002).

*Visa Denials.*    Visa decisions, as a general matter, fall within the domain of the Legislative and Executive Branches—with Congress setting the terms for acceptance and denial and the President and the Department of State exercising considerable discretion in implementing those requirements through U.S. consulates around the world. *See Kleindienst v. Mandel*, 408 U.S. 753, 754–56 (1972); *see also United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542–43 (1950).    Out of this allocation of power has sprung the doctrine of consular non-reviewability, a no-trespass rule under which the courts rarely second guess the decisions of consulates to deny or grant applications.    As we have put the point, Congress has "authority to set the terms upon which a person without status in the United States may procure a visa and enter the country" as well as the "attendant prerogative" to refer "the power to welcome, exclude, or expel individuals without lawful status to the executive branch."    *Amiri v. Sec'y, Dep't of Homeland Sec.*, 818 F. App'x 523, 526 (6th Cir. 2020).    This allocation of authority to the First and Second Branches over visa applications rarely permits the Third Branch to police the decisions.    *Almario v. Att'y Gen.*, 872 F.2d 147, 150 (6th Cir. 1989); *see Yafai v. Pompeo*, 912 F.3d 1018, 1020 (7th Cir. 2019); *United States ex rel. London v. Phelps*, 22 F.2d 288, 290 (2d Cir. 1927); *United States ex rel. Ulrich v. Kellogg*, 30 F.2d 984, 986 (D.C. Cir. 1929).

We say rarely because a modest exception remains.    If a consulate's decision implicates the constitutional rights of United States citizens or lawful permanent residents, a court may review a challenge to the application.    In such circumstances, a court may review the decision solely to determine whether the consulate provided a facially legitimate reason for its visa decision. *See Matushkina v. Nielsen*, 877 F.3d 289, 294 (7th Cir. 2017); *Amiri*, 818 F. App'x at 527.    We do not "look behind" the decision or apply further scrutiny to it.    *Kleindienst*, 408 U.S. at 770.    Even a "statutory citation" to the pertinent restriction, without more, suffices.    *See Hawaii*, 138 S. Ct.  at 2419; *Sesay v. United States*, 984 F.3d 312, 316 (4th Cir. 2021).

In applying the doctrine, we thus must distinguish between the claims filed by Ahmed's family and those filed by Ahmed.    While each proposed claim remains futile, distinct explanations show why.

As to the claims of Ahmed's wife and children, the doctrine of consular non-reviewability applies in full force. We have no authority to second guess the visa decisions of the American consulate in Yemen and thus leave those decisions in place. *Hawaii*, 138 S. Ct. at 2419. "For more than a century," the Court recently pointed out, it "has recognized that the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Id.* at 2418 (quotation omitted). Nor may Ahmed's wife or children side-step this prohibition by invoking their own federal constitutional rights. Noncitizens living abroad do not have any American constitutional rights. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) ("[I]t is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution.").

As to Ahmed, the question is whether the visa denials violated his constitutional rights. They did not. American residents—whether citizens or legal residents—do not have a constitutional right to require the National Government to admit noncitizen family members into the country. *See Kerry v. Din*, 576 U.S. 86, 96–97 (2015) (plurality opinion).

The same holds true for spouses. An American resident has no right to have his noncitizen spouse enter or remain in the country. *Almario*, 872 F.2d at 151. Nothing in the Constitution creates a right to bring a noncitizen spouse into the United States. *Din*, 576 U.S. at 93. Nor is the right to bring a spouse into this country "deeply rooted in this Nation's history and tradition" or otherwise "implicit in the concept of ordered liberty," *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quotation omitted), such that we may enforce it through substantive due process, *Din*, 576 U.S. at 95–96. The "long practice of regulating spousal immigration" through the immigration laws, *id.* at 95, shows that Ahmed's asserted right is anything but "deeply rooted." In the absence of a constitutional right to the contrary, the consulate's visa denials of applications by family members remain where they usually do: outside our purview.

Ahmed pushes back on several fronts.

He claims that we recognized a substantive due process right to visas for family members in *Bangura v. Hansen*, 434 F.3d 487 (6th Cir. 2006). But *Bangura* in truth cuts the other way. It held that the plaintiff failed to state a substantive or procedural due process claim. *Id.* at 495–96. In reaching this outcome, it reasoned that discretionary visa denials do *not* infringe upon constitutional rights, including the right to marry. *Id.* at 496; *Almario*, 872 F.2d at 151; *see also Oforji v. Ashcroft*, 354 F.3d 609, 618 (7th Cir. 2003) ("The law is clear that citizen family members of illegal aliens have no cognizable interest in preventing an alien's exclusion and deportation.").

Nor does the two-Justice concurrence in *Din* advance Ahmed's claim. A United States citizen argued in that case that the government violated her constitutional rights when it denied her husband's visa application. A plurality of the Court reasoned that the denial of this visa application did not implicate any constitutional rights because there is no substantive right to bring a spouse into the United States. *Din*, 576 U.S. at 101. Although two Justices assumed for the sake of argument that a substantive right exists, they concluded that the consulate had given a facially legitimate reason for denying the visa and that this was the most that the Constitution potentially required. *Id.* at 102 (Kennedy, J., concurring in the judgment). *See generally Yafai*, 912 F.3d at 1022. The Court, in short, left the substantive question for another day. But our court has not. We have already rejected this substantive claim. *Almario*, 872 F.2d at 151. Other circuits have, too. *See Silverman v. Rogers*, 437 F.2d 102, 107 (1st Cir. 1970) ("Even assuming that the federal government had no right either to prevent a marriage or destroy it, we believe that here it has done nothing more than to say that the residence of one of the marriage partners may not be in the United States."); *Burrafato v. U.S. Dep't of State*, 523 F.2d 554, 555 (2d Cir. 1975) ("[N]o constitutional right of a citizen spouse is violated by deportation of his or her alien spouse."); *Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958) ("[T]he wife has no constitutional right which is violated by the deportation of her husband.").

Ahmed's procedural due process claim does not improve matters. He argues that the statutes governing the visa-application process create a marriage and family-based liberty interest. *See* 8 U.S.C. §§ 1153(a), 1154(b). And he says that the consulate deprived him of that

interest without giving him adequate process. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). But even if we take this liberty interest as a given, the argument fails because the consulate provided a facially legitimate reason for the visa denials: concerns about Ahmed and his putative family's identity. 22 C.F.R. § 42.81(a); 8 U.S.C. § 1201(g); *see Din*, 576 U.S. at 102 (Kennedy, J., concurring in the judgment) (rejecting a similar argument). Such concerns in truth require the consulate to deny a visa application. 8 U.S.C. § 1201(g) ("No visa or other documentation shall be issued to an alien if . . . the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation."); 22 C.F.R. § 42.43 ("The consular officer shall suspend action in a petition case . . . if the officer knows or has reason to believe . . . that the beneficiary is not entitled, for some other reason, to the status approved."). Preferred visas for family members after all are available only for the real family of a real lawful permanent resident. 8 U.S.C. § 1153(a)(2)(A). These identity concerns gave the consulate "reason to believe" that the family did not qualify for them. 8 U.S.C. § 1201(g). It makes no difference that the consulate did not cite these statutes. If a bare citation to a statute suffices, *see Hawaii*, 138 S. Ct. at 2419; *Hussein v. Beecroft*, 782 F. App'x 437, 442 (6th Cir. 2019); *Sesay*, 984 F.3d at 316, so does a paraphrasing of its text. Ahmed "received all the process to which [he] was entitled." *See Din*, 576 U.S. at 102 (Kennedy, J., concurring in the judgment).

Ahmed insists that his family "provided the consular officer everything they needed" to confirm their identities. R.61-4 at 3. But that does not change matters. The reality that he could present evidence to address the consulate's concerns undercuts his submission that the *process* was unfair. As to the substance of the decision—surely his real concern—that is not our call to make. We have no authority to investigate, or for that matter to oversee federal court discovery of, the merits of each consulate decision in this area.

Ahmed adds that the Administrative Procedure Act allows him to challenge the visa denials. But the APA says that it does not supplant "other limitations on judicial review." 5 U.S.C. § 702. The doctrine of consular non-reviewability predates the passage of the APA and amounts to one such limitation on judicial review that supersedes the APA's general authority to challenge a "legal wrong" caused by the national government. *See Saavedra Bruno v. Albright*,

197 F.3d 1153, 1160 (D.C. Cir. 1999) (quotation omitted); *Morfin v. Tillerson*, 851 F.3d 710, 711 (7th Cir. 2017). The APA thus does not offer an "avenue for review of a consular officer's adjudication of a visa on the merits." *Allen v. Milas*, 896 F.3d 1094, 1108 (9th Cir. 2018).

All in all, the district court aptly rejected the motion to amend the complaint on futility grounds.

*I-130 Petition.* After the government announced that it would submit Ahmed's petition for reconsideration and possible revocation, Ahmed moved to amend his complaint, alleging that the government has not undertaken the proper process to revoke his lawful permanent resident status and claiming that a denial of his I-130 petition without the proper process to revoke his status would violate his due process rights and the immigration regulations. He also sought a writ of mandamus to compel the agency to adjudicate his I-130 petition within 30 days.

The district court denied leave to amend his complaint in these ways, once again on futility grounds. Once again, it was correct.

The key impediment is that the claim is premature. Neither Ahmed nor we have any idea when the government will rule on his I-130 petition or when as a separate matter it might try to revoke his lawful permanent resident status. Nor do we know whether or if the government will provide adequate process in pursuing either potential route. That makes these claims unripe for federal court adjudication. "*If* and *when* do not a ripe controversy make." *OverDrive Inc. v. Open E-Book F.*, 986 F.3d 954, 958 (6th Cir. 2021); *see Trump v. New York*, 141 S. Ct. 530, 535 (2020) (explaining that claims depending on "contingent future events that may not occur as anticipated, or indeed may not occur at all," do not present ripe disputes) (quotation omitted).

As for his separate mandamus request, that would not survive a 12(b)(6) motion, making this proposed amendment to his complaint futile as well. *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010). The "extraordinary" writ requires Ahmed to show that he "has a clear right to relief," that the government official has a "clear duty to act," and that he has "no other adequate remedy." *Carson v. U.S. Off. of Special Counsel*, 633 F.3d 487, 491 (6th Cir. 2011) (quotation omitted).

Ahmed does not have a "clear right" to have his petition adjudicated within 30 days.  No statute sets a time frame for reconsideration of an I-130 petition.  The Immigration Services agency instead processes them in the order they arrive.  *Hussein*, 782 F. App'x at 444.  Only four months separated his petition's arrival at the processing center and his request for mandamus relief.  Although it has now been over a year, "[a] delay of less than two years by itself, given the limited resources and corresponding demands on our immigration offices, does not establish a plausible case for mandamus."  *Id.*  A backlog of petitions best explains the delay, *id.*, a problem perhaps exacerbated by the COVID-19 pandemic.  The district court aptly rejected the motion to amend the complaint to include these claims on futility grounds.

*Original Claims*.  One loose end remains to be tied.  Ahmed began this lawsuit by asking the district court, through a separate request for mandamus relief, to order the consulate to rule on his family's visa applications.  Before the district court reached a decision, the consulate denied the applications on the merits.  As Ahmed received the relief he asked for—a ruling from the consulate—the district court correctly determined that his original claims are moot.  *See id.*; *see also Church of Scientology v. United States*, 506 U.S. 9, 12 (1992).

We affirm.