**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SANDRA MUNOZ; LUIS ERNESTO ASENCIO-CORDERO,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF STATE; ANTONY J. BLINKEN, United States Secretary of State; BRENDAN O'BRIEN, United States Consul General, San Salvador, El Salvador,

*Defendants-Appellees*.

No. 21-55365

D.C. No. 2:17-cv-00037-AS

ORDER

Filed July 14, 2023

Before: Mary M. Schroeder, Kermit V. Lipez,[*] and Kenneth K. Lee, Circuit Judges.

Order;
Dissent by Judge Bress;
Dissent by Judge Bumatay

---

[*] The Honorable Kermit V. Lipez, United States Circuit Judge for the First Circuit, sitting by designation.

## SUMMARY[**]

### Immigration

The panel denied a petition for rehearing en banc after a request for a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration, in a case in which the panel held that: (1) where the adjudication of a non-citizen's visa application implicates a citizen's constitutional rights, due process requires that the government provide timely and adequate notice to the citizen of a decision that will deprive the citizen of that interest; and (2) because the government failed to provide timely notice here, it was not entitled to summary judgment based on the doctrine of consular nonreviewability.

Dissenting from the denial of rehearing en banc, Judge Bress, joined by Judge Lee, wrote that the court seriously overstepped its bounds in requiring the government, as a matter of due process, to provide its reasons for denying a visa within a "reasonable" time. When, as here, there is no showing of bad faith and the government has provided a facially legitimate and bona fide reason for denying a visa, there is no requirement that it provide the valid reason within a set time.

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges Callahan, Ikuta, Bennett, R. Nelson, Bade, and VanDyke, and joined by Judges Collins, Lee, and Bress in Part III-B, wrote that the panel's opinion

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

violated the separation of powers in three distinct ways: (1) by recognizing that citizens have a "liberty interest" in their spouse's visa denial; (2) by holding that the government's citation of the "unlawful activity" bar to admission is not enough to support a visa denial and that the government must instead always disclose the facts underlying such a denial; and (3) by creating a vague "timeliness" requirement for the doctrine of consular nonreviewability. In Part III-B, Judge Bumatay explained that due process does not require the court's new timeliness requirement.

## ORDER

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing en banc, Docket No. 39, is **DENIED.**

BRESS, Circuit Judge, joined by LEE, Circuit Judge, dissenting from the denial of rehearing en banc:

I respectfully dissent from the denial of rehearing en banc because our court seriously overstepped its bounds in requiring the government, as a matter of due process, to provide its reasons for denying a visa within a "reasonable" time. When, as here, there is no showing of bad faith and the government has provided a facially legitimate and bona

fide reason for denying a visa, there is no further requirement that it provide the valid reason within a set time. Our court's novel timeliness rule has no proper legal grounding. And it is inconsistent with the traditional deference we give to the Executive in this area, as embodied in the doctrine of consular nonreviewability and the separation of powers principles that are its foundation.

I therefore agree with Judge Lee's dissent at the panel level, *see Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 924–27 (9th Cir. 2022) (Lee, J. dissenting), and concur in Part III.B of Judge Bumatay's dissent from the denial of rehearing en banc. As Judge Bumatay lays out, there may well be other reasons why the plaintiffs' challenge in this case should fail. *See also Kerry v. Din*, 576 U.S. 86, 97, 101 (2015) (plurality op.); *Colindres v. U.S. Dep't of State*, ___ F.4th ___, 2023 WL 4140277, at *3–6 (D.C. Cir. June 23, 2023). But in this case, the clear legal infirmity in our court's new timing rule—and the confusion it will surely cause—provides more than sufficient reason to conclude both that the government should easily prevail and that en banc review was warranted.

---

BUMATAY, Circuit Judge, joined by CALLAHAN, IKUTA, BENNETT, R. NELSON, BADE, and VANDYKE, Circuit Judges; COLLINS, LEE, and BRESS, Circuit Judges, in Part III-B, dissenting from the denial of rehearing en banc:

Under the doctrine of consular nonreviewability, the federal government generally doesn't need to justify its visa decisions in court. Grounded in the separation of powers, the century-old doctrine provides that courts should not look behind the Executive's exercise of its discretion to exclude

aliens from our nation. As Justice John Marshall Harlan wrote long ago, Congress may entrust the "final determination" of whether an alien may enter the United States "to an executive officer," and "if it did so, his order was due process of law, and no other tribunal, unless expressly authorized by law to do so, was at liberty to re-examine the evidence on which he acted or to controvert its sufficiency." *Lem Moon Sing v. United States*, 158 U.S. 538, 545 (1895). That's because visa denials are a "fundamental sovereign attribute exercised by the Government's political departments," *Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)), and we largely defer to the decisions of those branches.

To be sure, consular nonreviewability yields to constitutional error. *See Khachatryan v. Blinken*, 4 F.4th 841, 849 (9th Cir. 2021). If a visa denial burdens the constitutional right of a U.S. citizen, we may engage in a "circumscribed judicial inquiry" over the denial. *Id*. (quoting *Trump*, 138 S. Ct. at 2419). But this doesn't mean that courts may second-guess a visa denial every time it's somehow connected to a citizen. Instead, we've cabined this narrow exception to nonreviewability in two important ways. First, U.S. citizens may mount a constitutional attack on a visa denial in only a narrow category of circumstances. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (recognizing that a visa denial may implicate the First Amendment right of U.S. citizens). Second, even when a constitutional right is implicated, the government only needs to give a "facially legitimate and bona fide reason" for the visa denial. *Id*. And the Supreme Court has set a rather low bar to meet this requirement: "respect for the political branches' broad power over the creation and administration of the immigration system mean[s] that the Government

need provide only a statutory citation to explain a visa denial." *Trump*, 138 S. Ct. at 2419 (simplified). In other words, citing a statutory bar to admission under 8 U.S.C. § 1182(a) ("Classes of Aliens Ineligible for Visas or Admission") usually satisfies constitutional concerns.

In this case, Luis Ernesto Asencio-Cordero, a native and citizen of El Salvador, was denied an immigrant visa. The government told him and his U.S. citizen wife, Sandra Muñoz, that the visa was denied because the Department of State believes that Ascencio-Cordero will enter the United States to commit "unlawful activity"—a statutory bar to admission. *See* 8 U.S.C. § 1182(a)(3)(A)(ii). Asencio-Cordero and Muñoz sued, alleging a violation of their constitutional rights and demanding that the visa denial be overturned. Under the doctrine of consular nonreviewability, this should have been an easy case. Even assuming a constitutional right was implicated, we should have dismissed the case because citing the "unlawful activity" statutory bar was enough to justify the government's decision.

Instead, we violated the separation of powers by granting ourselves greater authority to interfere with the Executive's visa processing decisions. Under our newly arrogated powers, we may now peek over the government's shoulder every time it denies a visa on security grounds if the government's explanation does not come quickly enough. *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 917, 920–24 (9th Cir. 2022). We got there by first recognizing that an American citizen has a "liberty interest" in her husband's visa application—a view of substantive due process not shared by any other circuit court. *Id.* at 916. Then, we held that citing the "unlawful activity" bar is not enough, and that the government must *always* disclose the facts underlying a

visa denial under § 1182(a)(3)(A)(ii).  *Id.* at 917.  We ended by creating a "timeliness" requirement for the doctrine of consular nonreviewability.  *Id.* at 920–24.  Under this new rule, if we think the government's justification for a visa denial comes too late, we can strip the government of its nonreviewability protection and order courts to "look behind" the visa denial.  *Id*. at 924.

Each one of these steps should have been reversed on en banc review.

\*

First, we should have ruled that citing the "unlawful activity" bar satisfied any notice requirement.  Under our precedent, we only require the government to explain a visa denial by citing a statutory provision that "specifies discrete factual predicates the consular officer must find to exist before denying a visa."  *Khachatryan*, 4 F.4th at 851 (simplified).  Here, the government did exactly that.  It told Asencio-Cordero and Muñoz that Ascencio-Cordero's visa was denied because it believes he will enter the country to engage in "unlawful activity."  *See* 8 U.S.C. § 1182(a)(3)(A)(ii).  The Supreme Court has already ruled that the adjacent "terrorist activities" bar under § 1182(a)(3)(B)—which, in part, similarly bars those "likely to engage after entry in any terrorist activity"—provides sufficient factual predicates and thus citing that bar satisfies any judicial inquiry.  *Kerry v. Din*, 576 U.S. 86, 105 (2015) (Kennedy, J., concurring).  If factual predicates are indeed necessary here, we should have treated these similar statutory bars similarly and held that citing the "unlawful activity" bar was enough.

By requiring more for the "unlawful activity" bar, we start down a road not traveled by our sister courts.  The D.C.

Circuit recently ruled that citing the "unlawful activity" bar alone satisfies the government's notice obligation. *Colindres v. U.S. Dep't of State*, No. 22-5009, 2023 WL 4140277, at *6 (D.C. Cir. June 23, 2023). Other circuits, including our own, have deferred to the government's citation of valid statutory bars to meet its notice requirements. *See Khachatryan*, 4 F.4th at 852 (citing the "visa fraud" bar under § 1182(a)(6)(C)(i) was enough); *Yafai v. Pompeo*, 924 F.3d 969, 970 (7th Cir. 2019) (Barrett, J., concurring with denial of rehearing) (citing the "alien-smuggling" bar under § 1182(a)(6)(E) was enough); *Del Valle v. Sec'y of State*, 16 F.4th 832, 841–42 (11th Cir. 2021) (citing the "false representation of citizenship" bar under § 1182(a)(6)(C)(ii) or the "unlawful presence" bar under § 1182(a)(9)(B)(i)(II) was enough). Two other circuits have gone so far as to hold that citing *any* valid statute of inadmissibility—regardless of its reference to factual predicates—is enough. *Baaghil v. Miller*, 1 F.4th 427, 432–34 (6th Cir. 2021) ("Even a 'statutory citation' to the pertinent restriction, without more, suffices."); *Sesay v. United States*, 984 F.3d 312, 316 (4th Cir. 2021) ("The Supreme Court has unambiguously instructed that absent some clear directive from Congress or an affirmative showing of bad faith, the government must simply provide a valid ineligibility provision as the basis for the visa denial.").

Indeed, aside from this case, no federal appellate court has ever ruled that a statutory citation fails to provide sufficient factual predicates to satisfy the government's notice obligations. So, at a minimum, we've strayed far from the center of judicial gravity on this issue. And we should have taken this case en banc to recenter our court.

**\*\***

Second, our novel "timeliness" requirement has no basis in the law.  In the hundred-year history of consular nonreviewability, no court has invented the rule that the government must act within a certain timeframe to gain its protection.  Our reformulation of the doctrine not only bucks history but flouts the will of Congress—Congress has explicitly said that the government has *no* duty to give timely notice to an alien excluded on security-related grounds, as here.  *See* 8 U.S.C. § 1182(b)(3).  And, as a practical matter, this new speedy-notice requirement will be an administrative nightmare.  Now consular officers will have to sift through countless visa applications to determine who is entitled to the heightened notice by relation to some citizen.  And besides, the officer will not know how quickly to act to avoid defying the Ninth Circuit.  That's because our court failed to even set clear parameters for the time limits, opting instead to opaquely provide that timing must be "reasonable." *Muñoz*, 50 F.4th at 922–23.  Respect for a co-equal branch of government means that we should have at least explained how the Executive can comply with our dictates.

**\*\*\***

Third, our court stands alone as the only circuit to hold that a U.S. citizen has a "liberty interest" in his or her spouse's visa denial.  The Supreme Court has repeatedly warned that we should be circumspect in divining unenumerated substantive rights from the Constitution's guarantee of "due process."  *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2247–48 (2022) ("We must . . . exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy

preferences of the Members of this Court." (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997))) (simplified). Here, contrary to the text, history, and structure of the Constitution, we reaffirm our recognition of a U.S. citizen's due process right over an alien spouse's visa denial. We should not have doubled down on our position, which reinforces a split with every other circuit to address this issue. *See Colindres*, 2023 WL 4140277, *5 ("[C]itizens have no fundamental right to live in America with their spouses."); *Baaghil*, 1 F.4th at 433 ("American residents— whether citizens or legal residents—do not have a constitutional right to require the National Government to admit noncitizen family members into the country."); *Silverman v. Rogers*, 437 F.2d 102, 107 (1st Cir. 1970) (similar); *Burrafato v. U.S. Dep't of State*, 523 F.2d 554, 555 (2d Cir. 1975) (similar); *Fasano v. United States*, 230 F. App'x 239, 239–40 (3d Cir. 2007) ("The Constitution does not recognize the right of a citizen spouse to have his or her alien spouse remain in the country." (simplified)) (unpublished); *Garcia v. Boldin*, 691 F.2d 1172, 1183–84 (5th Cir. 1982) (similar).

And we didn't need to reach this issue. If we had properly ruled that citing the "unlawful activity" bar was sufficient or that there's no such thing as a timeliness requirement for consular nonreviewability, we could have avoided this weighty constitutional issue entirely. We could have instead *assumed* that Muñoz possessed a constitutional interest over her husband's visa denial, but the government had still satisfied its due process obligations. *See Din* 576 U.S. 86 at 101–06 (Kennedy, J., concurring) (assuming— without deciding—that a constitutional interest over a visa denial exists); *see also Khachatryan*, 4 F.4th at 850 (similar).

\*

Because our decision conflicts with the constitutional design on multiple fronts, we should have reheard this case en banc.

I thus respectfully dissent from the denial of rehearing en banc.

## I.

### A.

Let's start with an immigration backgrounder. Under the Immigration and Nationality Act ("INA"), an alien must obtain a visa before entering and permanently residing in the United States. 8 U.S.C. § 1181(a). The INA creates a special visa-application process for aliens sponsored by "immediate relatives" in the United States. *Id*. §§ 1151(b)(2)(A)(i), 1153(a). Under this process, the citizen-relative first petitions on behalf of the alien, asking to have the alien classified as an immediate relative. *Id*. §§ 1151(f), 1154(a)(1). If a petition is approved, the alien may apply for a visa by submitting the required documents and appearing at a United States embassy or consulate for an interview with a consular officer. *Id.* §§ 1201(a)(1), 1202. Before issuing a visa, the consular officer must ensure the alien is not inadmissible under any provision of immigration law. *Id*. § 1361.

### B.

Now the facts. Sandra Muñoz is a citizen and lifelong resident of the United States. In July 2010, Muñoz married Luis Ernesto Asencio-Cordero, a native and citizen of El Salvador, who arrived in the United States in March 2005. In April 2015, after their "immediate relative" petition was

approved, Asencio-Cordero left the United States to obtain his immigrant visa from the U.S. Consulate in El Salvador. In May 2015, Asencio-Cordero had his initial consular interview. During that interview, Asencio-Cordero denied any association with criminal gangs.

In December 2015, the U.S. Consulate denied Asencio-Cordero's visa application on the grounds that he was inadmissible under § 1182(a)(3)(A)(ii). Recall this provision bars "[a]ny alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in any other unlawful activity." 8 U.S.C. § 1182(a)(3)(A)(ii). Aside from citing the "unlawful activity" bar, the U.S. Consulate did not provide any further explanation for Asencio-Cordero's visa denial.

After multiple attempts to overturn the visa denial, Muñoz and Asencio-Cordero sued the State Department in federal court in January 2017, alleging that the visa denial was not facially legitimate and bona fide and was decided in bad faith. The government moved to dismiss the case under the doctrine of consular nonreviewability. The district court ruled that Asencio-Cordero, as an unadmitted, non-resident alien, lacked a right of judicial review and dismissed him from the suit. On the other hand, because Muñoz was a U.S. citizen, the district court refused to dismiss her claim.

In September 2018, the government provided a joint discovery report that explained that the government denied Asencio-Cordero's visa application "after determining that [he] was a member of a known criminal organization." In November 2018, a State Department declaration further explained: based on interviews, a criminal review, and a review of Asencio-Cordero's tattoos, the government

believed that he was a member of MS-13, a singularly brutal gang. The State Department considers MS-13 to be a national security threat. *See* U.S. Dep't of State*,* 9 Foreign Affairs Manual 302.5-4(B)(2)(a)(5).[1] The government later warned that this gang information was gathered from law enforcement sources and that it was "extremely dangerous" to force the government to reveal its sources.

Muñoz and the government cross-moved for summary judgment. In March 2021, the district court ruled for the government. First, the district court found that Muñoz, as a U.S. citizen married to Asencio-Cordero, had a protected liberty interest in the visa denial. Second, the district court reasoned that the government could invoke the doctrine of consular nonreviewability because the government offered a bona fide reason for the visa denial. The district court rejected the government's initial argument that citing the "unlawful activity" statutory bar itself satisfied due process. But based on the State Department's declaration and other government information, the district court found that the government adequately explained the visa denial—the government's belief that Asencio-Cordero was a member of MS-13. Finally, the district court found that Muñoz had not shown that the government denied the visa in bad faith.

## C.

On appeal, a divided panel of this court reversed.

The majority first reaffirmed Muñoz's ability to sue, holding that "U.S. citizens possess a liberty interest in a non-citizen spouse's visa application," and that the government's

---

[1] https://perma.cc/QV6Y-EG3Q

denial of Asencio-Cordero's visa application infringed on that interest. *Muñoz*, 50 F.4th at 916.

Second, the majority said that citing the "unlawful activity" bar, § 1182(a)(3)(A)(ii), could not provide a legitimate and bona fide reason for the visa denial. *Id*. at 917. But like the district court, the majority concluded that the State Department's declaration explaining the connection to MS-13 provided enough information to meet the government's due process obligations. *Id*. at 918.

Even so, the majority ruled that this information was provided *too late*. The majority held that "where the adjudication of a non-citizen's visa application implicates the constitutional rights of a citizen, due process requires that the government provide the citizen with timely and adequate notice of a decision that will deprive the citizen of that interest." *Id.* at 921. Because the government didn't provide the facts justifying the visa denial for nearly three years, the majority held that the government did not meet this "timeliness" requirement and thus the government could not claim the protection of consular nonreviewability. *Id.* at 923–24. The majority then vacated and remanded for the district court to "look behind" the government's decision and decide the merits of Muñoz's claim. *Id.* at 924.

Judge Lee dissented. Because the State Department advised Muñoz that it believed her husband to be connected to MS-13 and, in Judge Lee's view, Muñoz could not show bad faith, "[t]hat should be the end of the story." *Id.* at 925 (Lee, J., dissenting). He found no reason to "craft[] an exception to the longstanding consular non-reviewability doctrine" by creating a timeliness requirement. *Id.* Finally, Judge Lee expressed concern that the timeliness requirement

was unclear and unworkable and would lead to confusion in the lower courts and at government agencies. *Id.* at 926–27.

## II.

Before getting into the many ways that our court gets this case wrong, it's worth providing some background on the doctrine of consular nonreviewability. So here goes:

### A. Plenary Authority of the Political Branches

Our deference to the political branches on immigration matters dates back over a century to at least the time of the Chinese Exclusion Act. In 1889, the Supreme Court held that the "power of exclusion of foreigners" was "an incident of sovereignty belonging to the government of the United States as a part of those sovereign powers delegated by the constitution." *Ping v. United States*, 130 U.S. 581, 609 (1889). The Court made clear that the admissibility of aliens is not "for judicial determination." *Id.* Instead, the issue was reserved "to the political department of our government, which is alone competent to act upon the subject." *Id. Ping* was the first of several late nineteenth-century cases granting the political branches significant deference when enacting and enforcing immigration laws. *See also Fong Yue Ting v. United States*, 149 U.S. 698 (1893); *Lem Moon Sing*, 158 U.S. 538; *United States v. Ju Toy*, 198 U.S. 253 (1905).

After the modernization of our country's immigration system, the political branches' plenary power in immigration was wielded by consular officers. Starting in 1917, consular officers became responsible for granting and denying visas. *See* Russell Wolff, *The Nonreviewability of Consular Visa Decisions: An Unjustified Aberration from American Justice*, 5 N.Y.L. Sch. J. Int'l & Compar. L. 341, 342 (1984). A pair of circuit court cases has often been credited as the

beginning of our refusal to review a consular officer's visa denial. *See, e.g.*, Gabriela Baca, *Visa Denied: Why Courts Should Review a Consular Officer's Denial of a U.S.-Citizen Family Member's Visa*, 64 Am. U. L. Rev. 591, 603 (2015). In *United States ex rel. London v. Phelps*, 22 F.2d 288, 290 (2d Cir. 1927), the Second Circuit stated it was "beyond the jurisdiction of the court" to review a visa denial because the "[u]njustifiable refusal" of a visa was a matter of "diplomatic complaint." Similarly, in *United States ex rel. Ulrich v. Kellogg*, 30 F.2d 984, 986 (D.C. Cir. 1929), the D.C. Circuit noted Congress did not authorize "official review of the action of the consular officers," which made those decisions unreviewable.

The Supreme Court inaugurated the doctrine of consular nonreviewability in *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950). There, the German wife of a naturalized U.S. citizen and World War II veteran challenged her exclusion from the country based on the Attorney General's determination that she posed a security concern under a 1941 immigration provision. *Id.* at 539–40. The Court ruled for the government, holding that the Court has "no authority to retry the determination of the Attorney General." *Id*. at 546.

To begin, the Court emphasized that "[t]he exclusion of aliens is a fundamental act of sovereignty." *Id.* at 542. And so when a government official acts to exclude an alien based on immigration law, "[t]he right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *Id*. The Executive may then delegate that authority to "a responsible executive officer of the sovereign," whose authority is "final and conclusive." *Id.* at 543. The Court disclaimed any authority to review consular decisions: "it is not within the

province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *Id.* In other words, "[w]hatever the procedure authorized by Congress is," the Court said, "it is due process as far as an alien denied entry is concerned." *Id.* at 544.

## B. The *Mandel* Exception

While *Shaughnessy*'s sweeping expression of the nonreviewability of consular decisions still governs, courts have recognized a "limited exception" to the doctrine when the denial of a visa implicates the constitutional rights of American citizens. *Andrade-Garcia v. Lynch*, 828 F.3d 829, 834 (9th Cir. 2016) (simplified).

The first articulation of the limited exception to nonreviewability came in *Kleindienst v. Mandel*, 408 U.S. 753, 756 (1972). There, Ernest Mandel, a nonresident alien and "revolutionary Marxist," sought to enter the United States as a journalist and public speaker. *Id.* He was found ineligible for admission as an advocate of communism, but the Attorney General gave him a discretionary waiver to enter the United States in 1962 and 1968. *Id.* at 756–57. Mandel attempted to enter again in 1969. *Id.* at 756. This time, the Attorney General declined to give him a third waiver because Mandel's 1968 trip "went far beyond the stated purposes of his trip" and "represented a flagrant abuse of the opportunities afforded him to express his views in this country." *Id.* at 759. Mandel sued alongside American professors who had invited him to, or expected to hear him, speak. *Id.* at 759–60. While the Court held that Mandel "had no constitutional right of entry," it noted that the denial of Mandel's visa implicated the professors' First Amendment rights. *Id.* at 762.

The Court first re-affirmed the "ancient principles of the international law of nation-states" that "the power to exclude aliens is inherent in sovereignty," and "a power to be exercised exclusively by the political branches of government." *Id*. at 765 (simplified). The Court then reiterated Justice Harlan's words:

> The power of congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.

*Id*. at 766 (quoting *Lem Moon Sing*, 158 U.S. at 547).

Yet the Court's analysis laid the groundwork for a future limitation to the doctrine of consular nonreviewability. The professors argued that the government must give a justification for the denial of Mandel's waiver. *Id*. at 769. In response, the government argued that the waiver decision was in the Executive's "sole and unfettered discretion, and any reason or no reason may be given." *Id*. The Court said it didn't need to reach this question because the Attorney General did inform Mandel of the reason for the waiver denial and "that reason was facially legitimate and bona fide." *Id*.

In concluding, the Court re-affirmed the "firmly established" rule that Congress has "plenary . . . power to make policies and rules for exclusion of aliens." *Id*. at 769–70. And "when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide

reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Id.* at 770.

From this, courts have required that the government give a "facially legitimate and bona fide reason" for a visa denial whenever the constitutional rights of a U.S. citizen are implicated. *See Cardenas*, 826 F.3d at 1167. In *Bustamante v. Mukasey*, 531 F.3d 1059, 1061 (9th Cir. 2008), our circuit became the first to recognize that visa denial may burden more than a citizen's First Amendment right. There, we held that a U.S. citizen had a "protected liberty interest in her marriage that gives rise to a right to constitutionally adequate procedures in the adjudication of her husband's visa application." *Id*. at 1062. We claimed this was a "straightforward" application of the Due Process Clause's "substantive right[]" to "life, liberty, and property." *Id*.

## C. *Kerry v. Din* and the Limits of the *Mandel* Exception

The Supreme Court recently limited the scope of the *Mandel* exception in *Kerry v. Din*, 576 U.S. 86, 105 (2015), and *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). In both cases, even assuming a visa denial implicated the constitutional interest of a U.S. citizen, the Court showed that the government can satisfy its constitutional obligations to provide a "facially legitimate and bona fide reason" for the denial by citing a valid statutory bar to admission.

In *Din*, a United States citizen sought to have her Afghani husband classified as an immediate relative and granted an immigrant visa. 576 U.S. at 86. But the Afghani citizen was formerly a civil servant in the Taliban regime, and his application was denied under 8 U.S.C.

§ 1182(a)(3)(B)—the exclusion for aliens who have participated in "[t]errorist activities." *Id.* at 88–90. In the Ninth Circuit, we concluded that the U.S. citizen "ha[d] a protected liberty interest in marriage that entitle[d] [her] to review of the denial of [her] spouse's visa," and that merely citing § 1182(a)(3)(B) could not satisfy due process. *Din v. Kerry*, 718 F.3d 856, 860, 868 (9th Cir. 2013).

The Supreme Court reversed, but the Justices did not agree on the grounds for doing so. The plurality opinion, authored by Justice Scalia and joined by Chief Justice Roberts and Justice Thomas, rejected the threshold premise that an American citizen could be injured under the Due Process Clause based on the denial of a spouse's visa. *Din*, 576 U.S. at 88–101 (plurality). The concurrence, written by Justice Kennedy and joined by Justice Alito, *assumed* that a U.S. citizen could assert a constitutional injury from a spouse's visa denial, but concluded that citing the "terrorist activities" bar was a "facially legitimate and bona fide reason" under *Mandel*. *Id.* at 101–06 (Kennedy, J., concurring). And the dissent, penned by Justice Breyer and joined by Justices Ginsburg, Sotomayor, and Kagan, would have held that the government's refusal to provide a clear reason for denying a visa violated a citizen spouse's due process right. *Id.* at 107–16 (Breyer, J., dissenting).

In our court, Justice Kennedy's concurrence turned out to be the most important. *See Cardenas*, 826 F.3d at 1171 (finding that "Justice Kennedy's concurrence controls"). Relying on *Mandel*, the *Din* concurrence reiterated that "an executive officer's decision denying a visa that burdens a citizen's own constitutional rights is valid when it is made on the basis of a facially legitimate and bona fide reason." 576 U.S. at 104 (Kennedy, J., concurring) (simplified). So the key constitutional question is whether the government

supplied a "facially legitimate and bona fide reason" for the visa denial. And on that question, the concurrence concluded that citing § 1182(a)(3)(B)'s "terrorist activities" statutory bar satisfies the government's burden. *Id.* Justice Kennedy's concurrence first reasoned that the statutory bar "establish[ed] specific criteria for determining terrorism-related inadmissibility" and thus exclusion under that provision showed a "facially legitimate" reason. *Id.* at 104–05. The concurrence also held that merely citing the "terrorist activities" bar established a "bona fide reason" because "§ 1182(a)(3)(B) specifies discrete factual predicates the consular officer must find to exist before denying a visa." *Id.* at 105.

In *Trump v. Hawaii*, the Court further limited the *Mandel* exception and adopted Justice Kennedy's view that statutory citation is enough to satisfy our review. In that case, the Court reviewed President Trump's order temporarily suspending entry of foreign nationals from seven countries based on risks of terrorism. *Trump*, 138 S. Ct. at 2403. The Court applied the *Mandel* framework to the case but emphasized its "narrow" and "deferential" standard of review. *Id.* at 2419. Most importantly, the Court seemingly coalesced around Justice Kennedy's view that citing a statutory provision is enough to satisfy due process: "In *Din*, Justice Kennedy reiterated that 'respect for the political branches' broad power over the creation and administration of the immigration system' meant *that the Government need provide only a statutory citation to explain a visa denial*." *Id.* (simplified) (emphasis added). Thus, the Court embraced the view that only limited notice—such as a statutory citation—is needed to justify a visa denial when a citizen's due process rights are implicated.

After *Din* and *Trump*, our court adopted a three-step inquiry to determine whether a visa denial violates the due process rights of a U.S. citizen based on Justice Kennedy's concurrence. *Khachatryan*, 4 F.4th at 851. "First, we examine whether the consular officer denied the visa under a valid statute of inadmissibility." *Id*. (simplified). If so, that satisfies the "facial legitimacy" step. Second, we consider whether the consular officer (1) cited a statutory bar to admissibility that "specifies discrete factual predicates the consular officer must find to exist before denying a visa," *or* (2) provided a "fact in the record that provides at least a facial connection to the statutory ground of inadmissibility." *Id*. (simplified). If the consular officer complies with either alternative, the government meets its burden on this step. *Id.* At the third step, we ask whether the plaintiff carried her burden of proving that the government's stated reason "was not bona fide by making an affirmative showing of bad faith on the part of the consular officer who denied the visa." *Id*. (simplified).

## III.

With this legal background in mind, it is easy to see how we erred in piercing the doctrine of consular nonreviewability here. Although the Supreme Court has recognized a limited exception to the doctrine, we greatly expanded judicial interference with visa denials—jettisoning the respect we must afford to the political branches in their protection of our borders. By aggrandizing our role, we diminish the separation of powers.

We made three significant errors in ruling for Muñoz. First, we improperly ruled that citing the "unlawful activity" bar is not enough to satisfy the government's notice obligations. Second, we invented a new dimension to the

consular nonreviewability doctrine: a time window that bars the application of the doctrine. These two errors lead to the third—having to resolve whether an American citizen has a "liberty interest" in the visa application of his or her spouse under the Fifth Amendment's Due Process Clause. If we resolved the first two questions properly, we didn't need to reach this difficult question.

I turn to each error in this order.

## A. Citing the "Unlawful Activity" Statutory Bar Satisfies Due Process

Even assuming Muñoz has a "liberty interest" in her husband's visa denial, the government satisfied its constitutional notice obligations here by citing the "unlawful activity" statutory bar and our court erred by holding otherwise.

To begin, we wrongly claimed that the government had "abandoned" the argument that the "unlawful activity" bar contains discrete factual predicates. *Muñoz*, 50 F.4th at 917. This is incorrect. In both the district court and the answering brief in our court, the government repeatedly argued that citing § 1182(a)(3)(A)(ii) was sufficient because that provision contained adequate factual predicates.

But, more importantly, we were mistaken in finding that § 1182(a)(3)(A)(ii) does not "specif[y] discrete factual predicates the consular officer must find to exist before denying a visa." *Id.* We reasoned that "[u]nlike surrounding provisions, § 1182(a)(3)(A)(ii) does not specify the type of lawbreaking that will trigger a visa denial." *Id.* To reach this conclusion, we ruled, without authority, that "a consular officer's belief that an applicant seeks to enter the United States for general (including incidental) lawbreaking is not a

'discrete' factual predicate." *Id*. Thus, we held that the government could *only* satisfy its burden to prove a "bona fide reason" by showing "a fact in the record" that provides "a facial connection to the consular officer's belief" that Asencio-Cordero sought to enter the United States to engage in unlawful activity. *Id*.

There are at least three problems with our ruling.

First, the "unlawful activity" bar under § 1182(a)(3)(A)(ii) provides sufficient "discrete factual predicates," and thus citing it provides a "bona fide" reason for denial. We have never precisely described what level of "factual predicates" a statute must have to provide adequate reason for a visa denial. But Justice Kennedy's analysis of the visa waiver provision at issue in *Mandel* provides us a point of reference. In that case, the Supreme Court examined the Attorney General's authority to waive inadmissibility "in [his] discretion." 408 U.S. at 754. Because the provision conferred the Attorney General with "unfettered discretion"—meaning he could deny waiver for "any reason or no reason"—the Supreme Court *had* to consider whether some underlying facts showed that the waiver denial in that particular case was "legitimate and bona fide." *Id*. at 769–70. Otherwise, the Court would have no basis to understand why Mandel had been denied admission. But compared to the "nearly unbridled discretion" in the *Mandel* provision, Justice Kennedy's concurrence observed that the "terrorist activities" bar "specifies discrete factual predicates the consular officer must find to exist before denying a visa." *Din*, 576 U.S. at 105 (Kennedy, J., concurring). So, by the term "discrete factual predicates," Justice Kennedy meant to distinguish between a statutory waiver provision lacking *any* factual predicates from one, like the terrorism bar, "controlled by specific statutory factors." *Id*. at 104.

Like the "terrorist activities" bar, the "unlawful activity" bar is controlled by specific statutory factors—that the alien "seeks to enter the United States to engage . . . in any . . . unlawful activity." 8 U.S.C. § 1182(a)(3)(A)(ii). Surrounding provisions exclude from this "unlawful activity" bar any conduct that constitutes espionage, sabotage, export violations, or activity to overthrow the government of the United States. *Id*. § 1182(a)(3)(A)(i), (iii). While a range of lawbreaking may fit these "statutory factors," it is more limited than the "unbridled discretion" found in *Mandel* and nearly as broad as the "terrorist activities" bar approved by the *Din* concurrence. *See Colindres*, 2023 WL 4140277, at *6 (holding that the "terrorist activities" bar is "written in the same general terms" as the "unlawful activity" provision here). Indeed, given Justice Kennedy's focus on *any* kind of factual predicate, perhaps citing *any* statutory bar satisfies our inquiry here. *See Trump*, 138 S. Ct. at 2419; *Baaghil*, 1 F.4th at 432–34; *Sesay*, 984 F.3d at 316.

Second, our belief that the "unlawful activity" bar is too broad to establish a "bona fide" reason echoes the argument made by the *Din* dissenters and rejected by the *Din* concurrence. In dissent, Justice Breyer asserted that the terrorism bar is so capacious that it provides no notice of the factual predicates for inadmissibility:

> [Section] 1182(a)(3)(B)[] sets forth, not one reason, but dozens. It is a complex provision with 10 different subsections, many of which cross-reference other provisions of law. . . . Some parts cover criminal conduct that is particularly serious, such as hijacking aircraft and assassination. . . . Other parts cover

> activity that, depending on the factual
> circumstances, cannot easily be labeled
> "terrorist." . . . At the same time, some
> subsections provide the visa applicant with a
> defense; others do not. . . . Taken together
> the subsections, directly or through cross-
> reference, cover a vast waterfront of human
> activity potentially benefitting, sometimes in
> major ways, sometimes hardly at all,
> sometimes directly, sometimes indirectly,
> sometimes a few people, sometimes many,
> sometimes those with strong links,
> sometimes those with hardly a link, to a
> loosely or strongly connected group of
> individuals, which, through many different
> kinds of actions, might fall within the broad
> statutorily defined term "terrorist."

*Din*, 576 U.S. at 113–14 (Breyer, J., dissenting) (simplified).
Justice Kennedy understood that § 1182(a)(3)(B) "covers a
broad range of conduct," but still maintained that citing the
provision was sufficient. *Id*. at 105 (Kennedy, J.,
concurring). Thus, contrary to our view here, the breadth of
the "unlawful activity" bar is no basis to find that it lacks
factual predicates sufficient to satisfy the "bona fide reason"
prong. *See Colindres*, 2023 WL 4140277, at \*6 ("[T]hat
level of specificity is not required.").

Third, we ignore that Congress has already determined
that aliens subject to the "unlawful activity" bar are not
entitled to *any* form of notice. *See* 8 U.S.C. § 1182(b)(3). In
*Din*, Justice Kennedy looked to the scope of the INA's notice
provision, § 1182(b)(3), to inform the scope of a citizen's
due process rights. *Id*. at 105–06. Recall that § 1182(b)(1)

generally requires the government to provide "timely written notice" to aliens found inadmissible, but notice is *not* required when aliens are barred on grounds related to terrorism or security. 8 U.S.C. § 1182(b)(3). Because § 1182(b)(3) expressly excluded the "terrorist activities" bar from any notice requirement, Justice Kennedy deferred to Congress's "considered judgment" "in this sensitive area" to determine that merely citing the terrorism provision was "constitutionally adequate." *Id*. at 106.

We disregard this analysis and skip the fact that § 1182(b)(3) *also* eliminates any notice requirement for aliens found inadmissible under the "unlawful activity" bar. *See* 8 U.S.C. § 1182(b)(3). If we are truly following Justice Kennedy's analysis, then citing the "unlawful activity" bar should also be constitutionally adequate. After all, as the Court said long ago, when the Executive branch excludes an alien under a grant from the Legislative branch, the "*order was due process of law*," and "no other tribunal . . . [may] re-examine the evidence" underlying the order. *Lem Moon Sing*, 158 U.S. at 545 (simplified) (emphasis added).

So like the terrorism bar, we should have found that citing the "unlawful activity" bar *alone* complies with due process. This would have ended our inquiry because the government told Asencio-Cordero that he was denied admission under § 1182(a)(3)(A)(ii). And because Muñoz hasn't shown that this justification was made in bad faith, her due process claim must fail.

As problematic as this analysis proves, our court's next error may be even more significant.

### B. Due Process Does Not Place a Time Limit on the Consular Nonreviewability Doctrine

For the first time in any circuit, our court holds that the doctrine of consular nonreviewability applies only if the government provides notice of the reason for a visa denial "within a reasonable time." *Muñoz*, 50 F.4th at 923. We base this new requirement on the view that due process requires that the "government provide *any* required notice in a timely manner." *Id.* at 921 (citing *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)) (emphasis added). We then *suggest* that a "reasonable time" might range between 30 days to one year. *Id*. at 923 ("Our understanding of reasonable timeliness is informed by the 30-day period in which visa denials must be submitted for internal review and the 1-year period in which reconsideration is available upon the submission of additional evidence."). Outside that window, we declare, the government is "not entitled to invoke consular nonreviewability to shield its visa decision from judicial review" and a court "may 'look behind' the government's decision." *Id*. at 924 (simplified). This is a serious error.

Given that the doctrine of consular nonreviewability is rooted in the separation of powers, we should reject efforts to create—out of whole cloth—novel burdens on the Executive branch. As explained by Judge Lee, our court's decree "conflicts with the separation-of-powers principle that Congress may prescribe the terms and conditions upon which aliens may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention." *Id*. at 925 (Lee, J., dissenting) (simplified). To impose a categorical time limit for consular nonreviewability has no basis in the text or history of the Constitution, Supreme Court precedent, or statute.

First, our court's timeliness requirement ignores that due process is context specific.  When it comes to the exclusion of aliens, courts have "largely defer[red] to the political branches" on what process is due.  *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1215 (9th Cir. 2022) (Bumatay, J., concurring).  That's because we must recognize that "the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Trump*, 138 S. Ct. at 2418 (simplified).  Thus, it's firmly established that "Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 522 (2003) (simplified).

Here, our court imports due process protections from a case about the termination of public assistance payments to the denial of visas.  *See Goldberg*, 397 U.S. at 267–68 (holding that a welfare recipient must receive "timely and adequate notice" of the reasons for the proposed termination of welfare benefits).  But there's no reason to tie the procedural protections required to end a citizen's public benefits to the process to deny an alien entry into the country.  Even assuming that American spouses of aliens have a liberty interest in their spouse's admission protected by due process, that doesn't mean they are entitled to the full panoply of rights afforded to citizens in the domestic setting.  Indeed, the *Goldberg* court talked about how those due process protections were necessary in the "present context" of welfare terminations.  *Id*.  Though the exclusion of an alien is serious, the rights involved are not the same as in domestic proceedings.  After all, unlike in the welfare termination setting, a citizen cannot obtain judicial review of a visa denial unless the government acted in "bad faith."

And so there's no basis to transfer procedural protections one-for-one here.

Second, our court's decision ignores the will of Congress. Remember, Congress has established that consular officers must give an alien "timely written notice" of the grounds for a visa denial. *See* 8 U.S.C. § 1182(b)(1)(B). But Congress has *expressly* exempted aliens found inadmissible under the "unlawful activity" bar from this timely notice requirement. *Id*. § 1182(b)(3); *see also Din*, 576 U.S. at 106 (Kennedy, J., concurring) ("[T]his notice requirement does not apply, when . . . a visa application is denied due to terrorism or national security concerns.") (simplified). As Justice Kennedy viewed it, § 1182(b)'s statutory notice provision was highly probative of the bounds of constitutional notice owed to citizen spouses in the visa context:

> Congress evaluated the benefits and burdens of notice in this sensitive area and assigned discretion to the Executive to decide when more detailed disclosure is appropriate. This considered judgment gives additional support to the independent conclusion that the notice given was constitutionally adequate, particularly in light of the national security concerns the terrorism bar addresses. . . . Under *Mandel*, respect for the political branches' broad power over the creation and administration of the immigration system extends to determinations of how much information the Government is obliged to

> disclose about a consular officer's denial of a
> visa to an alien abroad.

*Id*. While the *Din* concurrence addressed the substance of the notice needed under due process, the analysis applies with equal force to the *timing* of the notice.

Third, as a practical matter, our brand-new timeliness requirement is both burdensome and vague. Because the timeliness requirement applies only when certain "U.S. citizens' rights are burdened," *Muñoz*, 50 F.4th at 926 (Lee, J., dissenting), consular officers may not know which visas will be implicated. Will consular officers need to process every visa under the new timeliness regime to avoid a court later saying that it was handled too late thanks to the alien's connection to some American citizen? And we do not establish what constitutes timely notice. The only thing we know for sure is that three years is too late. *Id*. at 923 (majority opinion). But we merely *suggest* that notice is safe if given between 30 days to one year. *Id*. Expect an explosion of litigation to determine the true deadline to meet due process. That we have placed new burdens on the Executive's discretion without explaining how it can comply with those burdens makes matters worse. At a minimum, we should have taken this case en banc to clarify the government's obligations under our new regime.

Our court's creation of new hurdles for the Executive in the security context is troubling. Respect for the government's interest in protecting our security should give us more pause before inventing new due process regimes. As Judge Lee pointed out, government delays in providing notice may come into play when deciding whether it acted in bad faith, *id*. at 925 (Lee, J., dissenting), but no reason exists to categorically strip the government of consular

nonreviewability when dealing with security threats based on our arbitrary (and vague) deadlines.

## C. A Visa Denial Does Not Implicate the Due Process Rights of the Alien's U.S. Citizen Spouse

Thanks to the other rulings in the case, our court needed to make a weighty substantive due process decision—whether Muñoz has a protected liberty interest in her husband's visa application. Pre-*Din*, we recognized that a citizen possesses a protected liberty interest in "constitutionally adequate procedures in the adjudication of [a non-citizen spouse's] visa application." *Bustamante*, 531 F.3d at 1062. But we acknowledged in *Muñoz* that a plurality of the Supreme Court has rejected such a protected liberty interest. *Muñoz*, 50 F.4th at 915 (citing *Din*, 576 U.S. at 101 (plurality)). Despite this, relying on the fundamental right of marriage and the liberty interest of U.S. citizens to reside in their country of citizenship, we said that "the cumulative effect" of the denial of a citizen's spouse's visa was "a *direct* restraint on the citizen's liberty interests protected under the Due Process Clause." *Id.*

Repeatedly, the Supreme Court has cautioned lower courts from casually finding substantive rights under either the Fifth or Fourteenth Amendments' Due Process Clauses. Indeed, "we must guard against the natural human tendency to confuse what [due process] protects with our own ardent views about the liberty that Americans should enjoy." *Dobbs*, 142 S. Ct. at 2247. To avoid these concerns, we must be "guided by the history and tradition that map the essential components of our Nation's concept of ordered liberty." *Id.* at 2248. In other words, we ask "whether the right is 'deeply rooted in [our] history and tradition' and whether it is

essential to our Nation's 'scheme of ordered liberty.'" *Id*. (quoting *Timbs v. Indiana*, 139 S.Ct. 682, 686 (2019)).

Unfortunately, we did not heed these concerns in recognizing Muñoz's liberty interest here. While no one seriously questions the fundamental nature of the right of marriage, it is quite a stretch to extrapolate from that right a concomitant right over the adjudication of a spouse's visa. Indeed, our court failed to recognize the strong constitutional crosswinds here—that a "liberty interest" for a U.S. citizen over a visa denial directly conflicts with the political branches' plenary authority over the exclusion of aliens. Given the separation of powers concerns at play, we should have been more exacting before finding a new substantive right.

And as a historical matter, the view that an American citizen has a liberty interest in the visa application of her alien spouse is highly suspect. The *Din* plurality explained that such a proposed liberty interest is not a right "objectively, deeply rooted in this Nation's history and tradition." *Id.* at 92–93 (plurality). As Justice Scalia recounted, "as soon as Congress began legislating in [the immigration] area[,] it enacted a complicated web of regulations that erected serious impediments to a person's ability to bring a spouse into the United States." *Id*. at 96 (citing Kerry Abrams, *What Makes the Family Special?*, 80 U. Chi. L. Rev. 7, 10–16 (2013)). The *Din* plurality relied on a "long practice of regulating spousal immigration," including the Expatriation Act of 1907, which provided that "any American woman who marries a foreigner shall take the nationality of her husband," and the Immigration Act of 1921, which subjected fiancées and wives of citizens to strict quota requirements when minor children were granted non-quota status. *Id.* at 95–97. *See also Colindres*, 2023 WL

4140277, at *4–5 (surveying the immigration statutes passed at the turn of the 20th century that "limited spousal immigration").

To be sure, some contest this history. *See, e.g.*, Kerry Abrams, *The Rights of Marriage: Obergefell, Din, and the Future of Constitutional Family Law*, 103 Cornell L. Rev. 501, 540, 542 (2018) (suggesting that the *Din* plurality "uses history selectively to paint a picture of the past that, while technically accurate, misses the larger picture" and showing evidence that some immigration laws support a "strong preference for spousal immigration").

But this misunderstands the requirement that unenumerated rights be deeply rooted. Even if history shows that Congress has promoted family reunification at times, it has also sought to achieve different policy ends at other times. This contradictory legislation demonstrates, at a minimum, that any liberty interest in a spouse's visa application has shallow roots. And given the deep foundation of the political branches' plenary authority here, we shouldn't let such sparse evidence define a new substantive right.

## IV.

We violated the separation of powers in three distinct ways here. First, by recognizing that citizens have a "liberty interest" in their spouse's visa denial. Second, by declaring that the government must divulge evidence supporting why an alien should be barred for "unlawful activity." And third, by demanding that the government act under our vague new timeline. Any one of these errors deserved en banc review.

For these reasons, I dissent from the denial of rehearing en banc.